```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SECURITIES AND EXCHANGE
     COMMISSION,
 4
                       Plaintiff,
 5
                  v.                        23 CV 5326 (LAK)
 6
     LEGEND VENTURE PARTNERS, LLC,
 7
                       Defendant.           Oral Argument
 8                                          (via Microsoft Teams)
     ------------------------------x
 9                                          New York, N.Y.
                                            June 27, 2023
10                                          3:00 p.m.

11   Before:

12                         HON. LEWIS A. KAPLAN,

13                                          District Judge

14                            APPEARANCES

15   DANIEL LOSS
     LEE A. GREENWOOD
16   ANTONIA M. APPS
          Attorneys for Plaintiff
17
     CLARK SMITH VILLAZOR LLP
18        Attorneys for Defendant
     BY:  PATRICK J. SMITH
19        SELBIE L. JASON

20

21

22

23

24

25
```

1              (Case called)

2              THE COURT:  Good afternoon, everybody.  Did you just

3    change jobs, Mr. Loss?

4              MR. LOSS:  I did, your Honor.

5              THE COURT:  I figured that.

6              It's the SEC's nickel, so why don't you go ahead,

7    Mr. Loss.  I think the area of dispute is pretty confined at

8    this point.

9              MR. LOSS:  That's correct, your Honor.

10             The commission is here today on its application for

11   applicable relief pending a final disposition of this action.

12             The disputed issues, your Honor, involve the

13   appointment of a receiver, as well as the commission's

14   application for an order directing Legend to provide a verified

15   accounting.

16             The defendant Legend has consented, pursuant to its

17   submission of yesterday, to a preliminary injunction, an asset

18   freeze, an anti-litigation injunction, and an order prohibiting

19   Legend from destroying or concealing documents.

20             Your Honor is correct, the only issues in dispute at

21   this point are the appointment of a receiver and the SEC's

22   request for a verified accounting.

23             THE COURT:  OK.  Why don't you address the disputed

24   issues.

25             MR. LOSS:  Yes, your Honor.

1      The commission believes that the appointment of an

2 independent fiduciary, a receiver, is essential in this matter

3 for the reasons set forth in its moving brief as well its

4 reply.

5      In particular, Legend and the Legend Funds currently

6 remain in the control of the same principals who are at the

7 helm of the firm and control the funds during the period of the

8 fraud in this matter, during which time approximately $12.8

9 million of investor assets were siphoned off from investors in

10 the form of undisclosed massive markups to the benefit of the

11 principals and other Legend employees and sales agents.

12      This emergency, your Honor, is precipitated by the

13 fact that Legend has, as of approximately one week ago, on June

14 19, informed the commission that it would not consent to the

15 appointment of a receiver, and this is against the backdrop,

16 your Honor, of Legend's possession in its control of millions

17 of dollars worth of pre-IPO shares, purchase agreements for

18 pre-IPO shares that Legend currently is in custody of.

19      One of the relevant pre-IPO companies, based ON public

20 news reports, is anticipated to IPO in the near future and, in

21 addition, your Honor, there is recent indication, based on the

22 evidence presented with the commission's papers, that Legend is

23 out there again in the market seeking to find investments for

24 the benefit or the supposed benefit of clients. And up until

25 just a couple of days, your Honor, before the commission

1    brought this emergency action, its website was active

2    continuing to market pre-IPO shares for investors.

3          The defendant's proposed purported alternative

4    solution of a third-party custodian or distribution agent is

5    simply insufficient based on the facts here.  A third-party

6    custodian or distribution agent would not have the powers of a

7    receiver; for example, the ability to marshal assets for the

8    benefit of the estates and the ultimate benefit of investors in

9    the form of potentially clawing back funds that were

10   transferred by Legend to third parties, if that's appropriate.

11         In addition, based on --

12         THE COURT:  Including, I take it, possibly the

13   principals.

14         MR. LOSS:  That's correct, Judge.  That's correct.

15         In addition, as reflected in the declaration of Ms.

16   Melanie Cyganowski submitted with the SEC's moving papers,

17   there are a number of investors, many investors who have been

18   unable to obtain information about their investments from

19   Legend and, therefore, have turned to Ms. Cyganowski in her

20   role as the receiver in the related StraightPath action to

21   attempt to obtain information.

22         This too, the ability to serve as a point of contact

23   for investors, is an important duty that a receiver would have

24   that a distribution agent or third-party custodian would simply

25   be ill-equipped and unable to perform.

1            THE COURT:  Thank you.

2            Mr. Smith, you look mighty familiar.

3            MR. SMITH:  Good afternoon.

4            THE COURT:  How are you.

5            MR. SMITH:  Good, thanks.  How are you?

6            THE COURT:  Good.  I take it you are representing the

7   defendant.

8            MR. SMITH:  We are.  Together with my colleague,

9   Selbie Jason, who is on the line.

10           THE COURT:  I'll hear you.

11           MR. SMITH:  Thank you.

12           First, your Honor, there is no ongoing fraud.  I don't

13   think there is really much dispute about that.  There was a

14   voluntary cessation of sales activity back in October of 2022.

15   There has been no solicitation of new investments, no

16   additional receipt of investor funds.  I think it's clear from

17   the commission's submission that this economic activity ended

18   as of October of 2022.  These several items that they point to

19   as maybe there will be some ongoing -- renewed sales or renewed

20   sales activity do not really add up to an ongoing fraud.

21           The one issue on the website, they allege that the

22   website was taken down after we received notice that they were

23   going to file this action.  I think we submitted in our

24   opposition evidence that the reason the website was turned off

25   was a series of three failed payments because the credit card

1    was not being funded.  I think the website unfairly was just

2    still up as a matter of oversight.

3          There is a purchase of a lead list, but that's many,

4    many steps short of actual solicitation of investors obtaining

5    any additional money.

6          THE COURT:  What was the point of doing that?

7          MR. SMITH:  My understanding is that the lead

8    generator had sort of a blue-plate special and offered up the

9    leads cheaply.  The leads were purchased with maybe some overly

10   optimistic view that maybe sales activity could resume some day

11   where they could be resold at a profit.  That's my

12   understanding of why the lead list was purchased.

13         Since I've been engaged in January, there is a clear

14   understanding that there will be no renewed sales activity

15   while we continue.  We have had ongoing continuous discussions,

16   I believe constructive discussions, about potential settlements

17   with the staff, but there would be no renewed sales activity.

18         In any event, the consent preliminary injunction will

19   address these issues.  Your Honor is going to order Legend not

20   to engage in any additional sales activity and anyone who,

21   through Legend, violated that order would risk contempt.  That

22   adequately addresses the risk of potential ongoing fraud and it

23   is not a justification for a receiver here.

24         THE COURT:  Isn't there the following problem?  If I

25   were to conclude, and, frank to say, quite likely to do so,

1   that there is a substantial likelihood that the commission is

2   going to prevail here, the fact that the various people with

3   economic interests in your client have 12 or $13 million, that

4   may need to be clawed back in whole or in part.  And what's the

5   point of giving them an opportunity to do a better job of

6   hiding it, if they have done that at all, while this percolates

7   the law?

8           MR. SMITH:  The individual members, and there is

9   three, are not parties to this action.  Frankly, your Honor,

10  they are our client as well, and we have had ongoing

11  discussions with the SEC on how to settle the SEC's claims,

12  including claims for -- that involves substantial disgorgement.

13  Those discussions are ongoing.

14          Just think about the practical upshot of a receiver

15  here.  If the justification is, put a receiver in place to

16  pursue these claims, there is layering an expense in that would

17  burden any recovery for potential investors.

18          Where we are really coming from here is, we ought to

19  have a program in place that maximizes the outcome for each

20  Legend investor.  So there is seven stocks.  Legend investors

21  purchased interest in different funds -- and I don't think

22  there is any dispute about this -- all the Legend investors

23  bought stock at a particular price and Legend went and secured

24  purchase agreements and, in one instance, forward agreements

25  with counterparties, so it neatly ties out.  All of the stock

1    that the Legend investors subscribed to, there is purchase

2    agreements on the other side.  So when there is liquidity,

3    these investors will benefit.

4           A receiver interposed to pursue claims against the

5    principals has to be paid.

6           THE COURT:  That's not the only purpose of a receiver.

7    It's one of them.

8           MR. SMITH:  I'm addressing your Honor's question

9    about, there is $12 million in historical distributions.

10          If there is going to be fraud claims asserted against

11   these individuals, I think, frankly, the SEC is the one to do

12   it.  That would be at no cost and burden to investors.  If the

13   receiver were to do it, the costs associated with that

14   litigation would be borne by the receivership estate under the

15   SEC's proposal and would reduce investor recovery.  It's just

16   unclear whether those lawsuits will be successful or not.

17          Your Honor might find a likelihood of success.  Even

18   though we are consenting on the preliminary injunction, we

19   outlined the disclosures that were made for the purpose of

20   showing that, well, there may be a little bit more of a horse

21   race here than the SEC is indicating in its papers.  In other

22   words, investors were told in several different ways, this was

23   not a straight pass-through at cost.

24          Take the Triller example.  That's the stock that may

25   or may not go public imminently.  $15 a share was the level at

1    which Legend investors purchased.  They were told through the

2    PPM and through the operating agreement that there may be

3    markups charged and that Legend was going to go out through

4    affiliates and buy stock at lower levels, would profit from

5    that, and that profit would not be shared with the funds or

6    Legend investors.

7            THE COURT:  What were they told verbally?

8            MR. SMITH:  Unclear.  I think the SEC has put in some

9    evidence that there were oral misrepresentations.  We would

10   have the written disclosures to be considered against other

11   evidence of oral misrepresentations, and then we'd have

12   arguments about the total mix of information available to

13   investors and whether there in fact was a scheme to defraud

14   misleading statements made.

15           From the position of what the investors were signing

16   up for, investor expectations were on Triller, sticking with

17   that example, that they were getting Triller at $15 a share.

18   So when there is an IPO on Triller, if there is one, if the

19   stock comes out at $20 a share, they will profit $5 a share.

20   If the stock comes out at $15, they will break even.  Those are

21   the basic expectations of investors, and they were put on

22   notice that there might have been some markup up front.

23           If there are successful claims to claw back those

24   markups, that's just a benefit to investors if that ever comes

25   to pass.  But given the economics of the agreement between

1   Legend and its investors, $15 is the cost basis.  If there is

2   liquidity and the stock comes out higher, they will benefit.

3        They also signed up for an illiquid investment and an

4   uncertain future as to whether or not there would ever be an

5   IPO, so there is substantial risk on these investments.

6        I am not saying the SEC's allegations about

7   irregularities lack merit, but there will be litigation,

8   particularly if the receiver comes in and sues the principals

9   on a theory of the undisclosed markups.  There will be

10  litigation around the adequacy of the disclosure, and the

11  receiver's actions against the individuals may or may not be

12  successful.  That's all going to cost money.  Every dollar

13  spent on litigation is going to come out of any potential

14  recovery for Legend investors.

15       It does fairly raise the question, and I think for

16  this reason the SEC's proposal is wholly impractical.  There is

17  no liquidity in the entity.  There is no near-term liquidity

18  possible.  The only way to pay for the cost of this

19  receivership is through either reprogramming the proceeds of an

20  IPO.  Let's say Triller goes public in the next couple of weeks

21  and there is potentially millions of dollars of liquidity

22  available.  The receiver would grab that liquidity and then

23  make decisions about what to ask the Court and how to spend the

24  money, including on its own fees.  That's coming right out of

25  the recovery of Triller investors.

1              Our proposal is provide that, either through a

2    distribution agent or some other third-party custodian or

3    through Midway directly or through Legend, if your Honor crafts

4    a preliminary injunction that orders them to do this, that

5    Triller investors benefit as soon as possible from liquidity

6    and IPO.  If fortunately it goes public, Triller recovers right

7    away.  Why would we want to reprogram the IPO proceeds for

8    Triller, which a subset of Legend investors invested in, and

9    pay for an expensive receiver and other costs.  It's a bad

10   outcome for Triller investors.

11             I think the proposals we put forth is you have seven

12   stocks.  Each one stands on its own merit.  We shouldn't strip

13   investor choice out of the mix here.  And Triller investors

14   should benefit from an investor choice.  If and when the SEC --

15   if the case can't be settled with respect to the individual

16   principals, if and when the SEC is successful on its claims and

17   gets disgorgement of the undisclosed markups on the theories

18   they might assert, that would be an additional recovery for

19   Triller investors.  But given the economics of the Triller

20   investment, if it goes public next week at $20, I think there

21   is a pretty good argument that Triller investors got the

22   benefit of their bargain and made $5 a share.

23             With live claims, there is some potential recovery

24   that the SEC might be successful in prosecuting for the

25   undisclosed markups.

1          What we are really proposing -- let's have a plan that

2     at least gives a shot at making investors whole, not a plan

3     through an expensive receiver that necessarily locks in

4     expensive costs.

5          THE COURT:  Why should your clients, in all the

6     circumstances here, be trusted to get the maximum benefit out

7     of whatever can be realized on these investments rather than

8     saving their own hives, to whatever extent they think they can

9     do that?

10          MR. SMITH:  The order of the Court will take trust out

11     of the equation, number one.  If your Honor orders an asset

12     freeze and preliminary injunction and nothing can be done with

13     the purchase agreements other than letting them sit there until

14     there is a liquidity event and the order further provides that

15     we then have to apply to the Court for a permission to

16     distribute proceeds with a schedule -- and this is all tied

17     out, your Honor.  The SEC has it and we have it.  We have every

18     investor scheduled out, what they purchased, which stock, and

19     at what level.

20          THE COURT:  Who controls the decision, under your

21     proposal, as to whether to sell at any -- as to proceeding with

22     a transaction?

23          MR. SMITH:  Well, a transaction -- so the purchase

24     agreements basically are investments, five of them at least,

25     through a counterparty called Midway Venture Partners, which

1  runs a series of funds.  They either have their own

2  arrangements to get the stock.

3       But as we put in the declaration of Patrick Powers, a

4  principal of Midway, the agreements are valid, and they stand

5  ready to honor them.

6       THE COURT:  What is Midway and what is their

7  connection to your principals?

8       MR. SMITH:  There is no formal connection.  They are

9  the counterparty with Legend on these purchase agreements.  So

10  there is an arm's length business relationship with Midway.

11  Legend solicited investor funds, put it in the funds that they

12  managed through my client, Legend Venture Partners, and then

13  Legend negotiated with Midway to invest in their funds that has

14  exposure to Triller and others.

15       For example, here is how it would work, as I

16  understand it.  If Triller goes public, free-trading stock

17  would then be available to Midway.  Midway stands ready to take

18  that free-trading stock and, subject to the Court's approval,

19  either distribute it out directly to Legend's investors or to

20  place it in a brokerage account in the name of Legend

21  investors.  They are happy to administer that under the Midway

22  proposal.

23       If Legend is left with any role in this, we would then

24  apply to the Court and basically tell the Court, Triller just

25  went public.  I don't have in front of me the number of Triller

1    shares.  Let's say it's 50,000 shares.   There is 50,000 free

2    trading shares of Triller.

3            Your Honor, we have a plan of distribution for the

4    benefit of those Legend investors that invested in Triller, and

5    we want the Court's authority to direct Midway to distribute

6    those shares directly to Triller investors so they get the

7    benefit of their bargain.  In that liquidity event, the IPO

8    would take place, and Legend investors who chose Triller would

9    then get the benefit of their bargain.

10           All claims against the principals remain live.  We can

11   either leave the Legend principals in the mix or cut them out

12   entirely through either a distribution arrangement, a

13   distribution agent arrangement, or through Midway, which has,

14   essentially -- Patrick Powers essentially volunteered Midway to

15   do this by opening brokerage accounts.

16           It is also in his declaration, they don't intend to

17   charge fees, brokerage fees or otherwise, to administer this.

18   They will open up a series of accounts, will run a process

19   where Legend investors are advised to open brokerage accounts

20   at Midway.  If and when there is a liquidity event, that's

21   where the stock is going.  I think under any of our proposals,

22   Legend's principals never touch the stock, never touch the

23   cash.

24           Your Honor, for what it's worth, I'm representing

25   Legend and it's very important to my clients and us that Legend

1   investors are made whole and get the benefit of this bargain

2   I'm talking about here.

3           It's not a trust issue, your Honor.  I think we can

4   correct for trust, or we can completely cut them out and use

5   either the Midway solution or the distribution agent solution.

6           But really what I'm arguing for here is that we don't

7   build in a layer of costs to have a receiver in place that is

8   necessarily going to hurt investors.

9           Let's take the Triller example one step further.  I

10  think this sort of goes to one of the proposals that the SEC

11  made about one of the benefits of a receiver is some type of

12  equitable distribution plan.  That looks a lot like, if there

13  is a Triller IPO, the receiver would then take down the cash

14  proceeds of the IPO and have it in the receivership estate and

15  later would make a determination about some type of

16  distribution plan for the benefit of all Legend investors.

17          It's not clear to me that that says if Triller was the

18  only liquidity event that Triller investors would get the

19  benefit of their bargain.  It sounds like some portion of the

20  Triller proceeds would be reprogrammed to pay back some

21  potential investor loss to other classes of investors.

22          THE COURT:  You are getting ahead of us with that

23  because that would presumably be resolved in an application to

24  approve a distribution plan.

25          MR. SMITH:  Any plan, any future plan that doesn't

1    keep the classes of investors in each of the seven stocks

2    separate and bring forward the individual investment choice of

3    these investors.   Triller investors should benefit from any

4    Triller liquidity event, IPO.   Other investors simply need to

5    wait and see what happens.

6            Look, receivers are expensive.   Your Honor has seen

7    the fee applications in StraightPath.   I think 3.5 million

8    approximately has been approved with another roughly million

9    dollars -- it's over $4 million in fees.   There is no cash in

10   this potential receivership estate to pay anything.

11           I guess I should note here, your Honor, this not

12   StraightPath.   The SEC has marked this a related case.   We are

13   happy to have the case before your Honor.   But there are no

14   Ponzi allegations.   There is no commingling allegations.   There

15   is no missing fund allegations.

16           In fact, I think there is substantial agreement with

17   the SEC that the assets in Legend are these purchase

18   agreements, there is no cash and roughly $12 million of

19   historical distributions to principals, and then other

20   distributions or payments to pay for the unregistered sales

21   force.

22           We all know where the assets are.   A receiver doesn't

23   really need to come in and marshal assets that are already

24   marshaled.   We all know where it is.   Nonetheless, the receiver

25   is going to run her process and it's just going to cost money

1    and it has to come from somewhere.

2         One other potential source is maybe there is some fire

3    sale of the purchase agreements.  So Triller is a $15 basis for

4    investors and that money was paid over to Midway.  You could

5    sell that purchase agreement at a discount.

6         I think we are probably all aware that the venture

7    capital market over the last year, year and a half has, in some

8    instances, collapsed.  That's one of the reasons there has been

9    no liquidity.  But you probably can't sell these purchase

10   agreements at face.  If you do a fire sale of the purchase

11   agreements, you're locking in investor losses.  The money has

12   to come from somewhere.  Maybe it comes from a successful

13   lawsuit against the principals.  But, again, there is defenses

14   to that lawsuit, and any recovery from the principals years

15   away.  There is no near-term practical solution --

16        THE COURT:  Mr. Smith, are the principals asked, as a

17   condition of going down one of your routes, to escrow all or

18   any of the $12.8 million?

19        MR. SMITH:  They are not.  They have liquidity issues

20   themselves.  I'm not saying there were not substantial

21   distributions.  But we are not prepared to escrow -- the

22   nonparties to this case, they are not prepared to make an

23   escrow deposit to pursue one of these other paths.  I suppose

24   it's open for discussion.  That specific solution has not been

25   discussed with the SEC.

1          What they asked for in January, when I was first

2     getting into the case, was, please pay for the receivership,

3     and we respectfully declined to do so that.  They came back to

4     us about three weeks ago and said, we are going to seek a

5     receivership.  The question of cost was not raised.

6          We have not discussed with them, and it's probably

7     worth discussing, is there some way to make some type of

8     payment and then go down one of these other paths.  I'd have to

9     take that back to the individuals and discuss it with them.  I

10    think that would actually benefit investors, because we would

11    leave open the possibility of, again, these investors being

12    made whole if there is any recovery, an IPO.

13          THE COURT:  OK.  Let me hear a final word from

14    Mr. Loss.

15          MR. LOSS:  Apologies, your Honor.  A technical issue

16    here.

17          THE COURT:  Sounds like E.T. is returning.

18          MR. LOSS:  Apologies, your Honor.  One moment.

19          Your Honor, I have tried to switch the audio.  Are you

20    able to hear me now?

21          THE COURT:  Yes.

22          MR. LOSS:  Apologies, your Honor.

23          Mr. Smith raised a number of different issues, but I

24    think they boil down to two main problems.

25          One is that Legend is oversimplifying the issues in

1    terms of what could happen with respect to a distribution agent

2    or custodian.  On the other hand, Legend is overstating the

3    expense that is likely to result to investors from a

4    receivership.  Let me address both of those things in turn.

5            First of all, with respect to, why isn't this as

6    simple as simply having the shares of, let's say, Triller go to

7    the investors who purchased series interests in a fund that

8    bought Triller upon a Triller IPO.  Why isn't it just that

9    simple.  And there are a number of potential reasons, your

10   Honor, as to why that may not be an appropriate solution that

11   is in the best interests of all investors.

12           We have a situation here where all investors in the

13   Legend Funds were charged massive undisclosed markups.  They

14   were all victims of fraud.

15           Now, the particular size of the markup may have

16   varied.  They were all large, but they may have varied based on

17   the particular pre-IPO company at issue.  And, in addition,

18   whether or not they got lucky or get lucky in the future and

19   have one particular company end up IPO'g versus another company

20   IPO'g, it is not necessarily the case that whether the

21   investors are lucky or not in that respect or whether they were

22   lied to in terms of being charged a 60 percent markup versus a

23   100 percent markup, it is not necessarily so clear that the

24   most equitable result here for the benefit of all investors is

25   to simply adopt the distribution agent function that Mr. Smith

1    has advocated.  There are complexities in that regard.

2              In regard to addressing your Honor's questions about

3    the ability of a receiver to go out and marshal additional

4    assets for the benefit of the estate, a power that obviously a

5    distribution agent or third-party custodian would lack,

6    Mr. Smith said, in effect, and I'm paraphrasing here, but I

7    think he said, in effect, well, the SEC can go out and sue

8    third parties for free.  Your Honor, if that were the adequate

9    answer, then it would be an argument to defeat a receiver in

10   every single case where a receiver is appointed.

11             Now, the fact is, the SEC does have an ongoing

12   continuing investigation.  However, there are abilities and

13   potential powers that a receiver has in terms of clawing back

14   assets from third parties who may not even have committed any

15   wrongdoing but who are in possession of receivership property.

16   The receiver has that ability that the SEC may not have, and

17   there may be particular efficiencies in fact for a receiver to

18   marshal assets of the estate in that manner.

19             I would note in this respect that there is

20   substantial -- although there are differences, to be sure,

21   between StraightPath and Legend -- and in fact many of those

22   differences explain why the cost of a receivership in Legend is

23   anticipated to be substantially less than in StraightPath.

24   I'll elaborate on that in a moment, your Honor.

25             But while there are these differences between

StraightPath and Legend, there are also many commonalities in

terms of the overlap of investors and the overlap of folks who

received funds that potentially could be a estate property in

either Legend or StraightPath.  This stems from the overlapping

sales agents between the StraightPath action and in Legend as

well.

Let me for a moment, your Honor, now just -- I hinted

at it a moment ago, but let me address the concerns that

Mr. Smith raised with respect to the expense of the

receivership.  This case, from a standpoint of what it will

cost to have a receiver, is simply not StraightPath.  This

stems from a number of different factors.  Number one, there

are fewer, far fewer investors.  Number two, there was less

money raised.  Number three, there were not liquidity events to

date that caused additional enormous work for the receiver and

costly work for the receiver in a StraightPath action.  Those

are some of the differences.

When you add to that, your Honor, the fact that if the

Court were to consider the appointment of Ms. Cyganowski, the

StraightPath receiver in this matter, there would be very

significant efficiencies to be gained.

These efficiencies result from numerous facts.  They

result from the fact that there is 70 percent overlap in

investors from a standpoint of the amount of money raised from

investors.  They result from the overlapping sales agents

1  involved.  The overlap also means -- the overlap, in terms of

2  the investment structure, in terms of the pitch to investors,

3  in terms to the -- in terms of the way these funds were

4  organized and the way these investments were sold, all of that

5  has given the receiver in the StraightPath action, Ms.

6  Cyganowski, an incredible headstart so that she would be able

7  to hit the ground running in this matter.

8        Related to that, your Honor, there has already been a

9  claims process put in place in the StraightPath matter which

10  could be, the commission anticipates, easily adapted for

11  Legend, particularly when one takes into account the

12  overlapping in investors here who are already familiar with the

13  claims process from StraightPath.

14        Your Honor, I'm happy to answer any additional

15  questions that the Court has, but I don't want to belabor my

16  response here.

17        THE COURT:  Thank you.

18        One more question for you, Mr. Smith.  That is, assume

19  for the sake of argument that I grant the motion to appoint a

20  receiver.  Is there any reason why it shouldn't be retired

21  Judge Cyganowski?

22        MR. SMITH:  Your Honor, other than the expense issues

23  I've been noting, no.  And I would note that Mr. Loss did not

24  address near term how any of the costs of the receivership

25  would be funded.

1          I think that if we asked a Triller investor, do you --

2          THE COURT:  Mr. Smith, I've got to interrupt you

3     because you've had your say, and I just asked you a

4     straightforward question.

5          I do think it's fair to ask Mr. Loss, in view of your

6     statement, how the commission would propose funding the

7     near-term cost of a receiver.

8          MR. LOSS:  Your Honor, I think a couple of responses

9     to your question.

10         First is that Ms. Cyganowski has expressed a

11    willingness to take on this matter with the understanding that

12    there is not any near-term liquidity.

13         Secondly, your Honor, in response to your question, as

14    well as in response to a point that Mr. Smith raised earlier,

15    any of the potential actions to recover additional assets for

16    the benefit of the estate against third parties would be -- in

17    any such actions the receiver would be compensated on a

18    contingency basis.

19         THE COURT:  That's helpful.

20         Here is what I am going to do.

21         First of all, I'm obviously granting the preliminary

22    injunction.  That's effective as of now.

23         That contains, does it not, Mr. Loss, the

24    anti-litigation relief you're looking for.  It's part of the

25    preliminary injunction, isn't it?

1                MR. LOSS:  Yes, your Honor.

2                THE COURT:  I am going to reserve on the motion to

3        appoint a receiver, except to the extent that if I decide to do

4        it, it will be Ms. Cyganowski for all the reasons that have

5        been indicated.

6                I will give the defendant, including the principals,

7        until Wednesday to make in writing -- is today Tuesday?

8                MR. SMITH:  Today is Tuesday.

9                THE COURT:  I'll give you until Thursday to make a

10       written proposal to the commission, which is your last best

11       offer on an alternative to a receivership.  Obviously, if you

12       work it out with the commission at that point, I'll consider it

13       very carefully.  If you don't work it out, the commission will

14       have until next Tuesday to respond to your last best offer and

15       you, Mr. Smith, will have until next Monday to tell me why I

16       should take that rather than grant the receivership.

17               If you need to adjust these dates in a very modest

18       way, I'm happy to entertain that now.  That was off the top of

19       my head.  Other than that, it seems to me that's the way I want

20       to go.

21               MR. SMITH:  You're not contemplating a filing with the

22       Court; rather, we should sort of submit directly to the SEC our

23       proposal.

24               THE COURT:  In the first instance.

25               MR. SMITH:  This Thursday we get our proposal in.

1          They respond to us.  That was by the following week,

2     the following Wednesday?

3          THE COURT:  Monday.

4          MR. SMITH:  Monday.

5          THE COURT:  The following Monday.

6          Then if there is no agreement, you each have 24 hours,

7     with the defense going first and then the commission, as to why

8     I should accept the defense proposal rather than a receiver and

9     why I should not.  How is that?

10         MR. SMITH:  Very good, your Honor.

11         MR. LOSS:  Your Honor, understood.

12         Just with respect to the scheduling for the submission

13    to the Court, I believe your Honor mentioned 24 hours following

14    next Monday, which would be the 4th of July.  Would your Honor

15    have any objection --

16         THE COURT:  That's not very good.

17         MR. LOSS:  -- putting that off until July 5?

18         THE COURT:  Sure.

19         MR. LOSS:  The commission would also be prepared, if

20    you would like, your Honor, to submit a proposed preliminary

21    injunction order following the conclusion of today's hearing.

22         THE COURT:  Yes.  In all of the circumstances, it

23    ought to be agreed as to form by Mr. Smith, right?

24         MR. SMITH:  Yes, please.

25         THE COURT:  Work it out.  Get it to me.  I don't see

1    why you can't do that tomorrow.  Can you get that done

2    tomorrow?

3              MR. LOSS:  We can, your Honor, and we will do that.

4              THE COURT:  Good.  Thank you.  This was a very helpful

5    argument.

6              Good afternoon.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25